FREDERICK L. RAY et al.

*vs.*

E. I. DuPONT DE NEMOURS COMPANY.

Oxford.    Opinion March 16, 1923.

The rights of a littoral proprietor on Ponds over ten acres in extent are not effected by raising the water by means of a dam at the outlet, to the original height of the bed of the outlet channel, where such channel has been lowered.

Where Ponds over ten acres in extent are drained by lowering the outlet, the land exposed along the shores does not become the property of the adjoining littoral proprietors, and the flowing again of the land thus exposed by the erection of a dam at the outlet of the same height as the bed of the outlet channel before it was lowered in no way injures the littoral proprietor.

The evidence of the respondent in this case, corroborated as it is by the physical conditions now existing and by the results of well known natural laws indelibly written on the shores of and rocks in the Ponds described in the complainant's petition makes it manifest that the jury in arriving at its findings must have misinterpreted the evidence and disregarded the clear and comprehensive charge of the presiding Justice or were influenced by some bias or prejudice.

On motion for new trial.   This is a complaint brought under Chap. 97 of R. S., alleging damage to land of complainant by flowage caused by raising the water in Kezar Lakes in the town of Waterford by increasing the height of the dam on Kezar River at the outlet of the lakes.   The case was tried to a jury who found for the plaintiff on the question of liability, and defendant filed a general motion for a new trial.   Motion sustained.   New trial granted.

The case is fully stated in the opinion.

*Frank A. Morey*, for plaintiff.

*Bradley, Linnell & Jones*, for defendant.

SITTING:   CORNISH, C. J., SPEAR, PHILBROOK, WILSON, DEASY, JJ.

WILSON, J.   On a complaint filed under Chap. 97, R. S., alleging damages to complainants' land by flowage, two questions were

submitted to a jury: (1) Whether there had been any flowage of complainants' land and actual damages had resulted; (2) Whether the respondent Company, or its predecessor in title had gained by prescription any right to flow complainants' lands in the manner alleged in the complaint.

The jury answered the first question in the affirmative and the second in the negative, thus in effect finding that the respondent had without right flowed the complainants' lands as alleged and that damages had resulted, leaving the extent of the damages to be determined in accordance with Sec. 9 of Chap. 97, R. S.

The case comes before this court on a motion for a new trial on the grounds that these findings are against the law and the charge of the presiding Justice, and also are so manifestly against the weight of the evidence as to indicate that they were result of mistake, bias or prejudice.

If sustained by the evidence, we think no rule of law is necessarily violated by the findings. The real issue upon this motion is whether the dam constructed by the respondent Company in 1918 raised the waters of the Kezar Ponds, so called, in the towns of Lovell, Waterford and Stoneham in the County of Oxford above their natural levels.

The respondent Company strenuously contends that nearly fifty years ago the channel of the outlet of these Ponds was lowered by its predecessor in title, and that its dam as constructed during the period covered by this complaint raised the water in the Ponds no higher than it was accustomed to stand prior to the lowering of the outlet.

In 1874, the Nutter, Locke Co., of which Mr. Eben N. Fox appears to have been the chief owner operated a grist and saw mill in the town of Lovell on the outlet stream of these Ponds. Finding that they required more water to run their mill than the then natural flow of the stream provided, Mr. Fox conceived the idea that by deepening the channel of the stream at the outlet of the Ponds, the natural flow of the stream could thereby be augmented, and he could by this method avoid the payment of damages to the littoral proprietors which would follow if by a dam the waters of the Ponds were raised above their natural level. Whether he was right as a matter of law is immaterial now.

However, there can be no doubt from the evidence in this case that Mr. Fox did as a matter of fact in 1874 excavate and lower the bed of

the stream from the outlet of the lower Pond for a distance of several hundred feet. The channel of the stream shows it. Witnesses for the respondent testify to it and the water line along the shores of the Ponds corroborates them; and finally several of the complainants' own witnesses admit it, or that it was of common knowledge. As one of them, Mr. Kimball, states, it was done, "So as, as I understand, to lower these Ponds; so they could drain the Ponds lower."

· The only possible question is the depth of the excavation. Mr. Fox testified that he excavated the bed of the stream at the outlet to a depth of at least five and one half feet, and then constructed a dam there five and one half feet high. Such a dam, if maintained throughout the year, would obviously hold back the water in the Ponds at practically the same levels as the natural barrier, formed by the bed of the stream, held it before any excavating was done. Any injury suffered by the littoral proprietors from such acts would not be from flowage, but rather from lowering the waters of the Ponds below their natural level, if any part of the dam was removed or opened for the purpose of increasing the natural flow of the stream below.

To meet this evidence and sustain the findings of the jury the complainants offered testimony of men who had used the outlet stream for log driving during the last forty years, the statements of some of whom tended to show that no dam was ever constructed there by Mr. Fox or used by him in connection with his grist and saw mill. All agreed, however, that the dam or obstruction, which was there, was maintained for only a part of the year. Two admitted that there had been some excavating of the channel, though not to a depth of more than two feet, and one or more testified that they understood the dam was constructed by Mr. Fox and used in connection with his mill below.

Reliance is also placed by the complainants upon the testimony of several witnesses as to picking cranberries over a period of years on a bog, which it is claimed was overflowed in 1918 and 1919 by respondent's dam; and that a meadow near one of the Ponds, which for several years prior to the erection of the respondent's dam had been mowed, but which in 1918-19 was entirely submerged; also that waters held back by the respondent's dam killed trees along the shores on complainants' land, one of which at least was estimated by one witness to be seventy-five or one hundred years old and two feet

or more in diameter; and further that the respondent's predecessor in title, Mr. Fox, had on one occasion since 1874 paid to the complainants damages for flowage of their lands resulting from the maintenance of his dam at the outlet.

In the first place, but little of the complainants' testimony can have any bearing on the real issue; as with the exception of two witnesses it relates to conditions existing since 1874, and the testimony is all in accord that the old dam at the outlet was maintained but a short period in each year from 1874 to 1900, and from 1900 to 1918 was not used in connection with the mill at Lovell at all. The lowering of the outlet being established, cranberries may well have been picked and grass mowed at any time within the past forty years on bogs and meadows submerged by the maintenance throughout the year of a dam at the same height as the old dam, and bed of the channel before excavating.

Two witnesses testify to picking cranberries on the complainants' bogs prior to 1874; but in a half century the vegetation and physical condition along the shores of these Ponds, especially in the low lands, must have materially changed under the conditions which the evidence shows have existed since 1874. Under such conditions the exact location and extent of cranberry bogs more than half a century ago must be uncertain when dependent upon the memory of man. The tendency, of necessity, of cranberry vines would be to follow the receding waters, if they continue to live at all. It is common knowledge that this vine does not thrive in dry soil or lands not watered and covered from time to time by natural or artificial flowage. The cranberry bog of the complainants' predecessor in title in 1860-70, when the witness Lebroke picked berries upon it, may have been substantially in the same relative position as to the waters of the Pond as the cranberry bog of 1910-18, yet have been beyond the reach of the waters held back by the respondent's dam in 1918-19.

The age of trees is only susceptible of approximate determination even after cutting, and while standing, any estimate by an ordinary witness is a mere guess. Tree growth in fifty years varies widely according to whether conditions are favorable or otherwise.

Against the evidence submitted by the respondent we think the evidence offered by the complainants clearly should not have prevailed. The testimony of Mr. Fox that the channel was excavated

to a depth of five and one half feet is corroborated by evidence to which human testimony founded upon recollection of conditions existing between twenty-five and fifty years ago must yield.

The channel itself according to the testimony of the engineers, and if not true, it was a matter easily refuted, shows that it had been excavated to the depth of more than five feet. For two feet in height its sides had been built up vertically with rocks, and then extended on in an incline faced with rocks to a total height in places of nearly six feet. Two witnesses, Messrs. Briggs and Seavey, testified that the wings of the old Fox dam are still there with the planks presumably fastened to the mudsill of the old dam.

But evidence even more irrefutable is presented by the shores of these Ponds and the rocks rising from their waters which show beyond peradventure that prior to 1874 the normal high water was approximately six feet above the bottom of the excavated channel at the outlet and the mudsill of the old Fox dam and ten inches above its top and the crest of the respondent's dam. A condition irreconcilable with the conclusions of the complainants deduced from their evidence: that the outlet was lowered but little, if any, and the lands now claimed by the complainants as injured had never, or at least but once before, been covered with water.

This water line or berm, as it has been termed, could have been made by no other agency than by the waters of these Ponds standing at this level for a considerable portion of the year and over a long period of years, and certainly by no conditions existing since 1874. This is substantiated by the complainants' own testimony, that their lands have not during that period been overflowed, except on one occasion. When waters reached this point, not only the lands of the complainants, but the meadow referred to must have all been submerged to a greater depth and extent even than in 1918-19 by the respondent's dam, which is ten inches lower than the berm along the shores.

It is true that this berm or water line does not represent the low-water level of the Ponds and that the complainants are entitled to have the use of their lands in the natural state as far as low-water mark. When the waters of these Ponds were drained, it exposed the bed of the Ponds below natural low-water mark, but that did not transfer title to the exposed bed to the littoral proprietor. The

Ponds being over ten acres in extent the title to the land so exposed still remained in the State. To reflow it again in no way injures the complainants.

No evidence is offered by complainants in the face of the conclusive evidence that the outlet was lowered in 1874, to show the natural low-water level of these Ponds prior to that date. This burden is upon them and also to show that their lands above the natural low-water mark have been overflowed by the respondent's dam. We think they have failed to sustain this burden by any evidence on which the verdict or findings of the jury should be allowed to rest.

One of the complainants testified that at some indefinite time since 1874, and which a letter from Mr. Fox shows to have been in 1890, he presented a claim against Mr. Fox for flowage of these same lands and was paid the sum of twenty-five dollars after submission of the question to two referees. This is denied by Mr. Fox so far as the submission to referees and any payment is concerned, and the letter shows that he took the same attitude then as he takes now, viz.: that he had not by his dam raised the waters of these Ponds above their natural level. But even if by mutual agreement the question then raised was finally referred to two or more arbitrators and a payment made, the evidence is not sufficient to show that it rendered the issue here *res adjudicata* as between these parties, nor can it control against the convincing evidence now before this court.

As against the testimony of Mr. Fox and the respondent's engineers, corroborated as they are by the beds and sides of the excavated channel and by the results of well known natural laws indelibly written on the rocks and shores of these Ponds, we are of the opinion that the jury must have misinterpreted the evidence and disregarded the clear and comprehensive charge of the presiding Justice, or were influenced in arriving at their verdict by some bias or prejudice; and that their finding that any lands of the complainants had been overflowed by the respondent's dam is so clearly without foundation on any facts fairly and properly deducible from the evidence in this case, as to require it to be set aside and a new trial granted.

Entry must be:

*Motion sustained.*
*New trial granted.*